[Cite as *State v. Ward*, 2017-Ohio-4284.]

COURT OF APPEALS
DELAWARE COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO | : | JUDGES: |
| | : | Hon. Patricia A. Delaney, P.J. |
| Plaintiff - Appellee | : | Hon. Craig R. Baldwin, J. |
| | : | Hon. Earle E. Wise, J. |
| -vs- | : | |
| | : | |
| BRANDON WARD | : | Case No. 16 CAA 12 0055 |
| | : | |
| Defendant - Appellant | : | O P I N I O N |

CHARACTER OF PROCEEDING:     Appeal from the Delaware County
Court of Common Pleas, Case No.
16-CR-I-08-0377

JUDGMENT:     Affirmed

DATE OF JUDGMENT:     June 13, 2017

APPEARANCES:

For Plaintiff-Appellee                    For Defendant-Appellant

 CAROL HAMILTON O'BRIEN           JOEL M. SPITZER
Delaware County Prosecuting Attorney     97 S. Liberty Street
                                          Powell, Ohio 43065
By: MARK C. SLEEPER
Assistant Prosecuting Attorney
140 North Sandusky Street
Delaware, Ohio 43015

*Baldwin, J.*

{¶1}   Defendant-appellant Brandon Ward appeals his conviction and sentence from the Delaware County Court of Common Pleas. Plaintiff-appellee is the State of Ohio.

STATEMENT OF THE FACTS AND CASE

{¶2}   On August 5, 2016, the Delaware County Grand Jury indicted appellant on one count of rape in violation of R.C. 2907.02(A)(1)(c), a felony of the first degree, one count of rape in violation of R.C. 2907.02(A)(2), a felony of the first degree, one count of sexual battery in violation of R.C. 2907.03(A)(2), a felony of the third degree, one count of sexual battery in violation of R.C. 2907.03(A)(3),  a felony of the third degree, and one count of theft in violation of R.C. 2913.02(A)(1), a misdemeanor of the first degree.    At his arraignment on August 10, 2016, appellant entered a plea of not guilty to the charges.

{¶3}   On October 4, 2016, appellant entered a plea of guilty to theft. A jury trial on the remaining charges commenced on the same date.

{¶4}    At the trial, M.W., the victim, testified that she was a student at Ohio Wesleyan in Delaware, Ohio, and in the summer of 2016, was a resident advisor in Bashford Hall. She testified that she also was employed at a daycare and as a waitress at a local restaurant. M.W. also was an intern at her church designing curriculum for the children's ministry.

{¶5}   On June 23, 2016, M.W. was walking to church for a meeting when appellant passed her on his bike and stopped her. She testified that she had never seen him before and had never had a conversation with him before. According to M.W., appellant told her that he had been following her for a little bit. Appellant then rode away after M.W. told him that she was going to church, but then he came back and stopped her

again and asked her if he could go to church with her sometime. M.W. agreed and the two exchanged phone numbers and eventually made plans to hang out later in the day.

{¶6}   After M.W. got off work at around 5:30 p.m., appellant met up with her outside of her dorm and the two of them went to Wendy's to eat and talk about church. M.W. testified that she paid for the food because appellant said that he did not have his wallet on him.  The two then walked around campus and then decided to go to Bashford Hall to hang out in the common area of the basement because it was cool. After listening to music in the basement, they then went up to M.W.'s dorm room, ordered Chinese food and sat on M.W.'s bed watching movies.  M.W. testified that there had not been any hand holding, kissing or touching of any kind up to that point.  While watching a movie, M.W. fell asleep while wearing her athletic shorts and a tank top.    When she laid down, appellant was sitting on the end of her bed.

{¶7}   M.W. testified that when she woke up, her pants were down, she was on her stomach and appellant's penis was in her vagina. She testified that they had never had any kind of physical contact before and had not discussed having sex that night. M.W. testified that she then rolled off of her bed, pulled up her shorts and asked appellant to leave. After appellant, who kept asking her what was wrong, did not leave right away, M.W. grabbed her purse, phone and laptop and left to go the resident advisor office in the basement. When she went back towards her room to get her phone charger, which she had forgotten, M.W. passed appellant in the hallway as he was leaving.

{¶8}   M.W. then went into her room and locked the door. When asked what she did next, she testified that she took the sheets off of her bed, changed her clothes because she wanted to be clean again and called a friend at around 11:30 p.m. M.W. put the

clothes and bedding into her laundry hamper in her dorm room. M.W. testified that she told her friend David that "something bad happened" and asked if he could come by and help her. Trial Transcript at 264. She then left her dorm room and went and sat on the stairs because she did not want to be alone there.

{¶9} When M.W.'s friend arrived, M.W. realized that she did not want to be around him or touched by him because he was male and she was scared of him. The two went up to M.W.'s dorm room. M.W. testified that while staying near the door, she told her friend that she had fallen asleep and that when she awoke, "things were happening that I didn't want to happen." Trial Transcript at 265. After her friend asked if she needed to go to the hospital, M.W. agreed and he drove her there. M.W. testified that she did not want David to go into the hospital with her and that she went into the hospital and told a nurse that she needed a rape kit done. The nurse then asked M.W. if she had been raped and M.W. indicated that she had and agreed to have the police called.

{¶10} M.W. testified that when a police officer knocked on the door of the room that she was in, she got scared because the officer was a large man. The officer then left. M.W. later spoke with Detective David McQuigg and told him that she did not want to press charges because she wanted to get her father's advice about what to do. After M.W. agreed that Detective McQuigg could take photos of the scene and retrieve the sheets and the clothes that she had been wearing, he drove her back to her dorm. As she was looking around her dorm room. M.W. noticed that money that she had been saving in a large pickle jar was gone and became angry. M.W. then told the Detective that she wanted to press charges for the theft. After talking with her father who advised her to press charges when she was ready, M.W. called Detective McQuigg and informed

him that she wanted to press charges. When asked if she had consented to having sex with appellant, M.W. testified that she had not and further testified that she would not have permitted him to have sex with her if she was not asleep at the time.

{¶11} At trial, Officer Adam Graham of the Delaware City Police Department testified that he received a dispatch to Grady Memorial Hospital on the early morning of June 24, 2016 on a sex offense case. When he arrived at the room where M.W. was located, M.W. panicked and ran to the back of the room acting as if she was in fear of him. The Officer then left the room without speaking to M.W. and contacted Detective McQuigg.

{¶12} Detective David McQuigg of the Delaware City Police Department testified that he met with M.W. in the bereavement room of the hospital and she was "withdrawn, very quiet, timid, meek,…" Trial Transcript at 195. He testified that M.W. told him that she was uncertain what she wanted to do and told him that at that point, she did not want him to conduct an official criminal investigation. Detective McQuigg gave M.W. a ride back to her dorm and took pictures of her room. According to the Detective, M.W. indicated that appellant had taken in excess of $600.00 of tip money that she had been keeping in a jar. M.W. was "[s]hocked and anger (sic)". Trial Transcript at 201.     Detective McQuigg testified that M.W.'s bed was stripped and that the bedding had all been placed in a hamper along with M.W.'s clothing. According to the Detective, M.W. asked him to investigate appellant for the theft of her cash, but said that she was still undecided about the sexual assault.

{¶13} Detective McQuigg testified that he spoke with appellant who asked him if he was being investigated for a sexual assault. The Detective told appellant than he was

only being investigated at that time for a theft offense. Appellant indicated to the Detective that he had had consensual sex with M.W. During a later telephone conversation, appellant said that he had had consensual sex with M.W. and denied taking her money, although, according to the Detective, appellant said that he was willing to make payments to M.W. to make it right.

{¶14} On cross-examination, Detective McQuigg testified that M.W. was hesitant in answering his questions and seemed to change her mind several times during the interview as to how she wanted to proceed. He admitted that she told him that if she got her money back, she would not pursue appellant for sexual assault. On redirect, he testified that he told M.W. that he could not use the theft offense as leverage and that the next morning, M.W. e-mailed him and apologized for her comments, stating that she had been angry and let her emotions get the best of her.

{¶15} Appellant testified at trial in his own defense. Appellant testified that he began kissing M.W.'s body while on her bed and that she had her arms wrapped around him. He testified that M.W. was awake with her eyes open and seemed to be enjoying herself. He further testified that he started caressing M.W.'s vagina through her clothes and that she was conscious the whole time and talking to him. According to appellant, he eventually performed oral sex on M.W. while she was awake and alert. He testified that appellant spread her legs open during oral sex and that this led to consensual sexual intercourse.

{¶16} Appellant testified that 30 to 40 seconds into the intercourse, M.W. sat up and asked what he was doing and asked him to leave. She then left the room. Appellant testified that he took the money out of the jar and admitted to pleading guilty to theft.

Appellant testified that he then left M.W.'s room and, while leaving, saw M.W. in the hallway of the dorm. While he testified that he asked her what happened, he further testified that she did not respond.

{¶17} On cross-examination, appellant testified that he believed that he was the victim in this case and that M.W. had set him up. He testified that he felt that when M.W noticed the money was missing, she wanted revenge even though they had had consensual sex. As evidence, appellant cited that a female outside of the dorm room that M.W. was talking to was laughing at him and smirking. Appellant testified that earlier that evening, he had seen M.W. with such person when he went out for a smoke. The following is an excerpt from appellant's testimony at trial:

{¶18} Q: You said that you didn't take the money till the end of the night, right?

{¶19} A: Yeah.

{¶20} Q: So you hadn't taken the money at the time you see this supposed other person outside with piercings in her nose that gives you the smirk look laughing, right?

{¶21} A: I didn't take the money till when?

{¶22} Q: You didn't take the money till after you see this person outside on the stairs?

{¶23} A: No. After we had sex and she got up and walked away from me.

{¶24} Q: But it was your belief that the person outside that gave you that smirk was evidence that [M.W.] was going to set you up?

{¶25} A: It wasn't really evidence, it was just weird. I thought it just didn't add up.

{¶26} Q: So that setup had to have come into [M.W.'s] mind and been her plot before she ever finds out her money's missing?

**{¶27}** A: It would have been, I just thought it was a possibility.

**{¶28}** Q: You - -

**{¶29}** A: I felt like 'cause she got up and then she was - - she immediately got on her laptop and was typing on her laptop walking down the hallway.

**{¶30}** Q: All right. Let's talk about that. You said to Detective Madden, as the story goes on, you know what I'm saying, like, I knew it was something fishy because, like, she got up and she grabbed her laptop and she walked out and, like, she went to the end of the hallway.

**{¶31}** That's what you thought was fishy, that she got up and left with the laptop?

**{¶32}** A: Yeah. She was texting on her computer, like, she opened it up, she started walking down the hallway and she was writing somebody, looked like.

**{¶33}** Q: Okay.

**{¶34}** A: And she got to the end of the hallway by the door, I don't know who she was writing, but she got to the end of the doorway and that's when she - - she turned around towards me.

**{¶35}** Q: And that's further evidence you believe that [M.W.] was setting you up, that was her intention to set you up?

**{¶36}** A: Yeah. It was a possibility. It didn't add up. It didn't make sense why she got on her computer like that.

**{¶37}** Q: And, again, that was before you had taken her money, right?

**{¶38}** A: Yeah.

**{¶39}** Q: So this setup plan that [M.W.] had concocted would have occurred before you stole her money?

**{¶40}** A: Yeah.

**{¶41}** Trial Transcript at 385-387.

**{¶42}** Appellant admitted at trial that after taking M.W.'s money, he put the top back on the jar so that M.W. would not notice right away that her money was missing. He further agreed that only reason that M.W. was accusing him of rape was because "it's all about the 600 some dollars, she's working three jobs so she's pissed, right?" Trial Transcript at 402.

**{¶43}** At the conclusion of the evidence and the end of deliberations, the jury, on October 5, 2016, found appellant guilty of the two counts of sexual battery and not guilty of the two counts of rape. As memorialized in a Judgment Entry filed on November 16, 2016, appellant was sentenced to 54 months in jail for sexual battery in violation of R.C. 2907.03(A)(3)[1] and to 180 days for theft. The trial court ordered that the sentences be served concurrently to one another. Appellant also was ordered to pay restitution.

**{¶44}** Appellant now raises the following assignments of error on appeal:

**{¶45}** DEFENDANT-APPELLANT'S CONVICTION FOR TWO COUNTS OF SEXUAL BATTERY WAS NOT SUPPORTED BY SUFFICIENT, CREDIBLE EVIDENCE.

**{¶46}** DEFENDANT-APPELLANT'S CONVICTION FOR TWO COUNTS OF SEXUAL BATTERY WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

**{¶47}** DEFENDANT-APPELLANT WAS DENIED THE RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL AND A FAIR TRIAL UNDER THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND OHIO CONSTITUTION, ARTICLE I, SECTION 10.

---

[1] Appellee conceded at sentencing that the two counts of sexual battery merged.

{¶48} DEFENDANT-APPELLANT WAS DEPRIVED OF HIS RIGHT TO DUE PROCESS AND A FAIR TRIAL UNDER THE FEDERAL AND STATE CONSTITUTIONS BY THE CUMULATIVE EFFECT OF NUMEROUS ERRORS IN THIS CASE.

I, II

{¶49} Appellant, in his first and second assignments of error, argues that his conviction for two counts of sexual battery is against the sufficiency and manifest weight of the evidence. We disagree.

{¶50} The legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different. *State v. Thompkins,* 78 Ohio St.3d 380, 1997–Ohio–52, 678 N.E.2d 541, paragraph two of the syllabus. The standard of review for a challenge to the sufficiency of the evidence is set forth in *State v. Jenks,* 61 Ohio St.3d 259, 574 N.E.2d 492 (1991) at paragraph two of the syllabus, in which the Ohio Supreme Court held as follows:

An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.

{¶51} In determining whether a conviction is against the manifest weight of the evidence, the court of appeals functions as the "thirteenth juror," and after "reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility

of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be overturned and a new trial ordered." *State v. Thompkins,* supra, 78 Ohio St.3d at 387. Reversing a conviction as being against the manifest weight of the evidence and ordering a new trial should be reserved for only the "exceptional case in which the evidence weighs heavily against the conviction." *Id.*

{¶52} We note the weight to be given to the evidence and the credibility of the witnesses are issues for the trier of fact. *State v. DeHass,* 10 Ohio St.2d 230, 237 N.E.2d 212 (1967). The trier of fact "has the best opportunity to view the demeanor, attitude, and credibility of each witness, something that does not translate well on the written page." *Davis v. Flickinger,* 77 Ohio St.3d 415, 418, 1997–Ohio–260, 674 N.E.2d 1159.

{¶53} Appellant, in the case sub judice, was convicted of sexual battery in violation of R.C. 2907.03(A)(2) and (A)(3). R.C. 2907.03 states, in relevant part, as follows: (A) No person shall engage in sexual conduct with another, not the spouse of the offender, when any of the following apply:…

{¶54} (2) The offender knows that the other person's ability to appraise the nature of or control the other person's own conduct is substantially impaired.

{¶55} (3) The offender knows that the other person submits because the other person is unaware that the act is being committed.

{¶56} R.C. 2907.01(A) defines "sexual conduct" as follows: "(A) "Sexual conduct" means vaginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex; and, without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus, or other

object into the vaginal or anal opening of another. Penetration, however slight, is sufficient to complete vaginal or anal intercourse." R.C. 2901.22(B) provides as follows:

> (B) A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist. When knowledge of the existence of a particular fact is an element of an offense, such knowledge is established if a person subjectively believes that there is a high probability of its existence and fails to make inquiry or acts with a conscious purpose to avoid learning the fact.

**{¶57}** Appellant specifically contends that there was not sufficient credible evidence that M.W. was substantially impaired at the time of the sexual activity or that he knew that she was substantially impaired and unable to appraise the nature of or control her own conduct.

**{¶58}** In the case sub judice, M.W. testified that while she was watching a movie with appellant, she laid down and ended up falling asleep while fully clothed. When asked what she remembered next, she testified that she "remembered waking up and feeling— well, my pants were down and he was behind me and kind of over top of me." Trial Transcript at 260. She further testified that appellant's penis was inside of her vagina. According to M.W., the two of them never discussed having sex that night. While there was no evidence that M.W. was intoxicated or under the influence of drugs, the Eighth District Court of Appeals "has held that sleep constitutes a mental or physical condition that substantially impairs a person from resisting or consenting to sexual conduct." *Clark,*

¶ 21, citing *Graves.* When a person is unconscious, she is not in a mental condition to resist or consent to the sexual conduct." *State v. Jones*, 8th Dist. Cuyahoga No. 98151, 2012 -Ohio- 5737 at paragraph 30. (Citations omitted). See also *State v. Adams*, 9th Dist. Lorain No. 05CA008685, 2005- Ohio-4360, in which the court held that the evidence was sufficient to support defendant's sexual battery conviction. In such case, the victim had testified that, on two occasions, the defendant fondled her and digitally penetrated her while she was sleeping. We find that there was credible evidence that M.W. was substantially impaired at the time of the sexual offense.

**{¶59}** Appellant also asserts that there is no evidence that he knew that M.W. was asleep and unable to appraise the nature of or control her own conduct. However, as noted by appellee, M.W. testified that she fell asleep while fully clothed while appellant was sitting near her feet and that she later woke up with her shorts pulled down and appellant's penis in her vagina. Her testimony, if believed, establishes that M.W. was asleep during the sexual assault. As noted by appellee, appellant would have had to move from his position on M.W.'s bed, pull her shorts down and begin having sexual intercourse with her "all while she did not move and did not respond verbally in any way. It would be impossible for someone to have engaged in sexual conduct with M.W. in that manner and not have been aware that she was asleep."

**{¶60}** Based on the foregoing, we find that appellant's conviction for sexual battery is not against the sufficiency. We find that any rational trier of fact, after viewing the evidence in a light most favorable to the prosecution, could have found that appellant committed sexual battery beyond a reasonable doubt.

**{¶61}** With respect to manifest weight, we note that both M.W. and appellant testified at trial. While appellant testified that the sex was consensual, the jury, as trier of fact, was in the best position to assess his credibility. Clearly, the jury found appellant, who initially denied taking M.W.'s money but later pleaded guilty to theft, not credible. In short, we cannot say that the jury lost its way in convicting appellant.

**{¶62}** Appellant's first and second assignments of error are, therefore, overruled.

III

**{¶63}** Appellant, in his third assignment of error, contends that he received ineffective assistance of trial counsel.

**{¶64}** A properly licensed attorney is presumed competent. *State v. Hamblin*, 37 Ohio St.3d 153, 524 N.E.2d 476 (1988). Therefore, in order to prevail on a claim of ineffective assistance of counsel, appellant must show counsel's performance fell below an objective standard of reasonable representation and but for counsel's error, the result of the proceedings would have been different. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674(1984); *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989). In other words, appellant must show that counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result. *Id.*

**{¶65}** Appellant first argues that his trial counsel was ineffective in failing to move to a Crim.R. 29 Motion for Acquittal at the close of appellee's case-in chief and at the close of appellant's case-in-chief based on insufficiency of the evidence. However, as is stated above, we find that there was sufficient evidence supporting appellant's

convictions. Appellant, therefore, could not have been prejudiced by his trial counsel's failure to make a Crim.R. 29 motion.

{¶66} Appellant next argues that his trial counsel was ineffective in failing to exercise his last preemptory challenge to remove a juror. During voir dire, a juror, when asked if there was anything in her past that made her think that she could not be fair and impartial, stated "[p]robably, yes." Trial Transcript at 91. She then indicated that someone she used to babysit for her had made an advance on her and that it was very traumatic and that "[t]here's been a few other incidents involving sexual activity that have caused me some discomfort." Trial Transcript at 92. When asked if she could be a fair and impartial juror, the juror indicated that she was unsure but that if she was appellant, she would not want her on the jury. The trial court, after questioning the juror further, later excused her as a juror. We find that there was no prejudice to appellant.

{¶67} Appellant also maintains that trial counsel was ineffective in failing to vigorously cross-examine Amy Zoller, who was a registered nurse who performed a sexual assault examination on M.W. Appellant argues that trial counsel failed to cross-examine her on the absence of bruising, tears, DNA, and/or other specimens of appellant that would otherwise be present if a sexual battery had occurred. We note that at trial, Zoller testified that there was an indication of an abrasion to the bottom entry of the vagina. Moreover, whether or not M.W. had any type of physical injury was not relevant as to whether or not she was asleep at the time of the sexual conduct. As for DNA, since appellant admitted to engaging in sexual conduct with M.W., the presence or absence of his DNA was irrelevant.

**{¶68}** During cross-examination, appellant's defense counsel elicited testimony from Zoller that M.W. told her that she had difficulty relating a history of events, that M.W. spoke slowly and was tearful and that M.W. did not make eye contact with her during the examination. During closing arguments, defense counsel used such testimony in arguing that M.W.'s testimony was not credible and that M.W. "couldn't tell it straight because she was trying to cover up the truth, and the truth was she voluntarily consented to sexual activity with [appellant]…." Trial Transcript at 456.    We find that trial counsel was not ineffective, but rather exercised sound trial strategy because this case boiled down to a credibility determination between M.W. and appellant.

**{¶69}** Finally, appellant contends that trial counsel was ineffective in failing to conduct an independent investigation of the facts of the case outside of the provided discovery. According to appellant, if counsel had done so, counsel would have discovered that Zoller was the wife of an on-duty Delaware City Police Officer and could be biased and could have uncovered potential witnesses at the dormitory that night who could have provided exculpatory evidence benefiting appellant. To raise ineffective assistance claims based on matters outside the record, a defendant must pursue the post-conviction remedies outlined in R.C. 2953.21. *State v. Cooperrider*, 4 Ohio St.3d 226, 228, 448 N.E.2d 452 (1983). Therefore, the appellant's claim in this regard is not properly before this Court.

**{¶70}** Appellant's third assignment of error is, therefore, overruled.

IV

{¶71} Appellant, in his fourth assignment of error, argues that he was deprived of his right to due process and a fair trial by the cumulative effect of the numerous errors in this case.

{¶72} Because this Court, in overruling appellant's assignments of error, found no errors in this case, appellant's fourth assignment of error is overruled.

{¶73} Accordingly, the judgment of the Delaware County Court of Common Pleas is affirmed.

By: Baldwin, J.

Delaney, P.J. and

Earle Wise, J. concur.